UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

MARIA MEDRANO,

                         Plaintiff,                    **<u>MEMORANDUM & ORDER</u>**
                                                       15-CV-3081 (MKB)

           v.

CAROLYN W. COLVIN,
*Acting Commissioner, Social Security
Administration*,

                         Defendant.

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Plaintiff Maria Medrano filed the above-captioned action pursuant to 42 U.S.C. § 405(g)

seeking review of a final decision of the Commissioner of Social Security (the "Commissioner)

denying her claim for disability insurance benefits.  Plaintiff moves for judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, claiming that the

Administrative Law Judge Jay L. Cohen (the "ALJ") erred in (1) failing to find that Plaintiff's

impairment meets or equals the severity of the spinal disorders in Appendix 1 of the Social

Security Regulations, (2) according "limited weight" to the medical source statement of

Plaintiff's treating physician, (3) finding that Plaintiff's statements about her symptoms were not

entirely credible, and (4) determining that Plaintiff can perform her past work despite her

limitations.  (Pl. Not. of Mot. for J. on the Pleadings, Docket Entry No. 9; Pl. Mem. in Supp. of

Mot. for J. on the Pleadings ("Pl. Mem.") 8–9, Docket Entry No. 8.)  The Commissioner cross-

moves for judgment on the pleadings, arguing that the ALJ's decision is supported by substantial

evidence and should be affirmed.  (Def. Cross-Mot. for J. on the Pleadings, Docket Entry No. 12;

Def. Mem. in Supp. of Cross-Mot. for J. on the Pleadings ("Def. Mem."), Docket Entry No. 13.)

For the reasons set forth below, Plaintiff's motion for judgment on the pleadings is granted and the Commissioner's cross-motion for judgment on the pleadings is denied.

## I. Background

Plaintiff was born in 1975. (Certified Admin. Record ("R.") 125, Docket Entry No. 7.) During the period from 2005 until May 1, 2011, Plaintiff worked as a cook and then as a cashier at a White Castle restaurant. (R. 42–43, 210, 239.) On May 1, 2011, while "changing a box of soda" at work, Plaintiff fell backwards with the soda box in her arms. (R. 313.) The box, which weighed approximately fifty pounds, fell on top of her and caused her to twist her neck. (R. 313.) On April 23, 2012, Plaintiff filed an application for disability insurance benefits, alleging she was disabled since May 1, 2011, due to neck and back pain, arm numbness, memory loss and dizziness. (R. 123–28, 181, 185.) Plaintiff's application was denied, and she subsequently requested a hearing before the ALJ. (R. 63, 72–77.) Plaintiff appeared with her attorney before the ALJ on September 11, 2013. (R. 36–62.) By decision dated March 4, 2014, the ALJ found that Plaintiff was not disabled and denied Plaintiff's application. (R. 15–35.) On April 14, 2015, the Appeals Council denied review of the ALJ's decision. (R. 3–7.)

### a. Plaintiff's testimony

Plaintiff testified that she had completed two years of schooling.[1] (R. 42.) Plaintiff lives in an apartment with her three children, ages twenty-three, fourteen and thirteen. (R. 41.) From 2000 to 2004, Plaintiff worked as a manicurist and hand masseuse at a beauty salon. (R. 42–43.) Prior to her job as a manicurist, Plaintiff babysat, (R. 56–59), and worked in a factory packing

---

[1] In Plaintiff's Disability Report, which was completed by Plaintiff's attorney, Plaintiff indicates that she completed 12th grade in 1993. (R. 185, 186.) As discussed further, *infra*, the ALJ noted the discrepancies in Plaintiff's testimony about her educational background in assessing Plaintiff's credibility.

threads and shipping handbags, (R. 44). According to her testimony at the hearing, Plaintiff was disabled after an accident at White Castle that left her unable to carry heavy objects, move her neck, or sit or stand for long periods of time. (R. 44.) Plaintiff could sit for twenty to thirty minutes but had to change positions constantly. (R. 44–45.) She could stand for up to one hour at a time. (R. 44.) Plaintiff did not think she could do a job that required her to sit and stand intermittently throughout the day. (R. 51–52.) She could lift five pounds and walk for fifteen to twenty minutes. (R. 45.)

On June 23, 2011, Plaintiff had undergone neck surgery and, at the time of the hearing, she had attended physical therapy for her neck pain four times per week for two years. (R. 45–46.) Plaintiff still could not rotate her neck around or up and down, but the surgery enabled her to walk again. (R. 45.) Plaintiff's hands were numb, and her doctor had recommended further spinal surgery. (R. 46.) Plaintiff had previously been hospitalized for lupus in either 2006 or 2007. (R. 47.) She continued receiving treatment for lupus and was taking Hydroxychloroquine, which prevented the lupus from worsening. (R. 47.) She suffered from regular ovarian cysts and, in February of 2012, had undergone surgery to remove one such cyst. (R. 48.) Plaintiff stated that the operation had helped her ovaries, but that she was being treated for remaining cysts. (R. 48.) Plaintiff did not see a psychiatrist, psychologist or mental health therapist, and she did not take medication for a mental health condition. (R. 48.)

Plaintiff's daily routine consisted of helping her children prepare for school, reading the Bible, cooking light meals and driving to physical therapy nearby. (R. 48–51.) Plaintiff's daughter cooked most of the meals because Plaintiff could not take heavy things out of the refrigerator. (R. 49.) Plaintiff was able to wash glasses, but frequently could not complete household chores because of her neck pain. (R. 49, 51.) She visited her sister, went to church

every Sunday and used public transportation when she could be accompanied by her daughter. (R. 50.)  Approximately three to four days per week, Plaintiff remained in bed during the day due to pain and side effects from her medications.  (R. 51.)

### b. Medical evidence

#### i. Flushing Hospital Medical Center

##### 1. Before onset date of May 1, 2011

Between 2008 and the alleged onset date of Plaintiff's disability, Plaintiff visited Flushing Hospital Medical Center numerous times for treatment relating to hypertension, arthritis, lupus and ovarian cysts.  (*See* R. 665–720.)  For most of this time, Plaintiff's conditions were controlled by medications.  (*See, e.g.*, R. 672, 677–78, 690.)

On July 12, 2008, a computerized tomography ("CT") scan revealed a cyst in Plaintiff's left ovary.  (R. 290.)  Plaintiff returned to Flushing Hospital on September 28, 2008, reporting pelvic pain.  (R. 288.)  Doctors performed pelvic ultrasounds, which reflected that Plaintiff had an enlarged uterus, a small fibroid in her uterus and a complex cyst in her right ovary.  (R. 288.)  On April 30, 2009, doctors performed another pelvic ultrasound, which reflected fibroid changes in Plaintiff's uterus.  (R. 287.)

On July 13, 2009, Plaintiff was treated in the emergency room of Flushing Hospital for complaints of persistent joint pain in her fifth left finger, both knees and left ankle.  (R. 270–72, 562–64, 567–80.)  The doctors examining Plaintiff observed normal muscle strength, intact sensation and normal gait.  (R. 270.)  They further observed that Plaintiff was experiencing mild swelling in her knees, finger and ankle, but that she had no obvious deformity, rash or nodules. (R. 271.)  Plaintiff was discharged with diagnoses of joint pain and lupus exacerbation.  (R. 271.)

On June 18, 2010, emergency room ("ER") doctors treated Plaintiff when she reported

vomiting six times over the course of two days.  (R. 267–68.)  Plaintiff was administered and prescribed medication and was released without abnormality.  (R. 268–69.)

## 2.  After onset date of May 1, 2011

On May 9, 2011, Plaintiff was treated at the Flushing Hospital ER for persistent neck pain over the prior three days.  (R. 261–62.)  Plaintiff reported feeling an electrical sensation in her hands when she hyperextended her neck.  (R. 261.)  Doctors conducted x-rays on Plaintiff's spine, which returned no abnormalities.  (R. 261.)  Plaintiff was diagnosed with cervical strain and cervical disc disease with radiating pain in the nerves of her lower back.  (R. 262.)  Plaintiff was also diagnosed with hypertension.  (R. 262.)  She was administered Percocet and Motrin in the hospital and prescribed Lodine and Flexeril upon her release.  (R. 263.)

On or around December 1, 2011, Plaintiff reported to Flushing Hospital Medical Center's Department of Physical Medicine and Rehabilitation for physical therapy.  (R. 448.)  Her initial intake evaluation noted that she complained of numbness and tingling when bending over and lifting anything heavier than two pounds.  (R. 445.)  Plaintiff could not sleep on her side, and she experienced intense pain, which she assessed as an eight out of ten, when she tried to cook or wash dishes.  (R. 445–47.)  She could rotate forty degrees to the right and fifteen degrees to the left.  (R. 446.)  Plaintiff was able to walk for approximately "two to three blocks" and could not sit for longer than fifteen minutes at a time without changing positions.  (R. 447.)  She was given multiple functional body exercises to practice.  (R. 447.)

Throughout December of 2011, Plaintiff's pain assessment decreased to approximately six or five out of ten, depending on the day.  (R. 442–44.)  When she was taking medication, she reported that her pain level was approximately a three or four out of ten.  (R. 442–44.)  By early January of 2012, Plaintiff's physical therapy records reflected that she was able to sit up to

twenty or thirty minutes at a time before she had to change positions and needed something to place behind her head.  (R. 440.)  Plaintiff was still only able to walk two to three blocks. (R. 440.)  Plaintiff was able to rotate five additional degrees to the left.  (R. 439.)

On January 25, 2012, Plaintiff was treated in the ER for abdominal pain.  (R. 258–260, 376–386.)  A pelvic sonogram and abdominal CT scan revealed a uterine fibroid, thickened endometrium and a cyst in each ovary.  (R. 275–76.)  Plaintiff was diagnosed with endometriosis.  (R. 382.)

During her physical therapy sessions in late January and early February of 2012, Plaintiff assessed the intensity of her average pain as a two out of ten.  (R. 437.)  She assessed her most severe pain to be a three or four out of ten.  (R. 437.)  On February 3, 2012, Plaintiff could rotate her head fifty-five degrees to the right and thirty-five degrees to the left.  (R. 437.)  By February 10, 2012, Plaintiff could rotate her head fifty degrees to the left.  (R. 434.)  She reported that her neck pain was a one out of ten on average and a four out of ten at its most severe.  (R. 434.)

On February 21, 2012, Plaintiff underwent lacroscopic surgery for removal of a left ovarian cyst.  (R. 292–303, 360–375.)  Plaintiff's operation records reflect that she had complained of chronic pelvic pain for over a month, and that she assessed the intensity of her pain at approximately a seven or eight out of ten.  (R. 367.)  Plaintiff's surgery was successful, and she was placed on a pain management plan for recovery.  (R. 368–370.)  On March 8, 2012, Plaintiff returned for a surgical follow-up appointment.  (R. 612–14.)  She reported no pain or discomfort following her lacroscopic surgery.  (R. 613.)  Plaintiff's hypertension was stable and her medications for lupus were renewed.  (R. 613.)

In June of 2012, Plaintiff returned to Flushing Hospital Medical Center for joint and shoulder pain.  (R. 601–605.)  Plaintiff's intake reports reflect that she was having difficulty

sleeping because of interactions with her medications.  (R. 605.)  She was prescribed Tramadol for her pain.  (R. 604.)

On July 24, 2012, Plaintiff was treated for complaints of pain and swelling in her left ankle and left knee.  (R. 594–95.)  Plaintiff's knee exhibited crepitus, or a grating sensation or sound caused by friction between the bone and cartilage.  (R. 594.)  Plaintiff was prescribed medication for pain, as well as for lupus, vertigo and hypertension.  (R. 595.)

### ii.    Dr. Peng Zhao

On June 2, 2011, Plaintiff was examined by Peng Zhao, M.D.  (R. 465.)  In a White Castle medical release form, Dr. Zhao opined that Plaintiff could return to work on June 3, 2011, provided that she never lifted or carried an object of any weight and only occasionally bended, squat, crawled, climbed or reached above shoulder level.  (R. 465.)  Plaintiff was permitted to use her hands for simple grasping, light pushing and pulling, and fine manipulations.  (R. 465.)

In a letter dated June 13, 2011 and addressed "to whom it may concern," Dr. Zhao wrote that Plaintiff had a job-related injury and was experiencing hand numbness and neck stiffness. (R. 464.)  Dr. Zhao opined that Plaintiff should work reduced hours and refrain from lifting or carrying objects at work.  (R. 464.)  At Dr. Zhao's referral, Plaintiff received a magnetic resonance imaging ("MRI") test of her cervical spine on June 15, 2011.  (R. 459–460.)  The MRI showed a large intervertebral disk herniation compressing Plaintiff's spinal cord at disks C4–C5 and an intervertebral disk herniation and mild central spinal canal narrowing at disks C5–C6 and C6–C7.

In a letter dated June 16, 2011 and addressed to the staff at White Castle, Dr. Zhao wrote that Plaintiff's cervical spine MRI reflected a large intervertebral disk herniation.  (R. 461.) Dr. Zhao stated that he had referred Plaintiff to Jamaica Hospital for a neurosurgical evaluation.

(R. 461.)  He then wrote that Plaintiff "can't work from now."  (R. 461.)

Plaintiff underwent a pre-surgical evaluation at Jamaica Hospital that day.  (R. 885–911.)
Plaintiff was given a collar to hold her neck and was diagnosed with a cervical disk herniation
and hypertension.  (R. 887–890.)  She assessed the intensity of her pain as a six out of ten.
(R. 891.)  She was told to see Dr. Robert Donadt for a follow-up evaluation.  (R. 887–89.)

### iii.  Dr. Robert B. Donadt

On June 17, 2011, Plaintiff visited Robert B. Donadt, M.D. for an evaluation of her
cervical spine pain.  (R. 450–51.)  Plaintiff told Dr. Donadt of her accident at White Castle and
informed him that she had been experiencing increased numbness in her arms and, as a result,
had begun dropping objects when she held them.  (R. 450–51.)  Plaintiff reported pain and
electric shock radiating down her arms.  (R. 450.)  Dr. Donadt noted that Plaintiff stood up
slowly and had a steady gait.  (R. 450.)  She had a "marked decreased range of motion" and
resisted extension of her neck.  (R. 450.)  Dr. Donadt advised Plaintiff that she needed to
undergo neck surgery in order to relieve pressure from her spinal cord and alleviate her
symptoms.  (R. 451.)  Plaintiff and Dr. Donadt discussed alternatives to, and risks of, surgery,
and Dr. Donadt prescribed pain medication for Plaintiff.  (R. 451.)  He told Plaintiff that he
would make arrangements for her to undergo surgery the following week.  (R. 451.)

From June 21 to June 25, 2011, before and after her neck surgery, Plaintiff was
hospitalized at Jamaica Hospital.  (R. 913–1058.)  Plaintiff underwent neck surgery on June 23,
2011.  (R. 315–16.)  Dr. Donadt performed a C4–C5 anterior cervical discectomy with a spinal
fusion, inserting a structural allograft in Plaintiff's cervical spine.  Upon discharge, Plaintiff was
told to wear a neck collar during the day.  (R. 914.)

On July 11, 2011, Plaintiff returned for a post-operation visit with Dr. Donadt.  (R. 317.)

Plaintiff was wearing a neck collar. (R. 317.) She reported that the shooting electric pains in her arms had resolved and her neck pain had partially improved. (R. 317.) Plaintiff told Dr. Donadt that her pain increased as she moved, especially when she rotated left, and that she could not hold a telephone to her ear for a long time. (R. 317.) Plaintiff reported some left arm pain and left leg pain, and had stopped taking Percocet because it was making her sleepy, nauseous and dizzy. (R. 317.) Dr. Donadt noted that Plaintiff's gait was slow but steady, that she had some mild pain on restricted motion of her neck, especially on rotation, and that she should continue to wear her neck collar. (R. 317.) Dr. Donadt also advised Plaintiff to exercise her arms for range of motion and walk on a regular basis. (R. 317.) He noted that Plaintiff remained "totally disabled from her job at White Castle." (R. 317.) Dr. Donadt asked to see Plaintiff approximately monthly unless her symptoms worsened. (R. 317.)

On August 19, 2011, Plaintiff visited Dr. Donadt for a follow-up evaluation. (R. 318.) Plaintiff told Dr. Donadt that her neck pain had greatly improved but that she was experiencing increased pain when she rotated left. (R. 318.) Plaintiff reported that the shooting electric pains in her arms remained completely resolved. (R. 318.) The pain in her left leg had abated significantly. (R. 318.) Plaintiff told Dr. Donadt that she had become dizzy and fainted and had experienced nausea and vomiting several times. (R. 318.) Dr. Donadt noted that, on examination, Plaintiff stood erect and had a steady gait. (R. 318.) He identified tenderness and tightness Plaintiff's neck and some limited rotation with pain. (R. 318.) Dr. Donadt observed that Plaintiff's post-operation x-rays reflected good alignment in her spine. (R. 318.) He encouraged Plaintiff to continue walking and to practice arm exercises for range of motion. (R. 318.)

On September 26, 2011, Plaintiff visited Dr. Donadt for a follow-up evaluation. (R. 320.)

Plaintiff reported that overall, her neck pain had improved greatly since the surgery. (R. 320.) The radiating numbness that she had felt in her arms prior to the surgery had abated, but she was experiencing intermittent numbness in her arms and on the side of her face, usually after sleeping. (R. 320.) Plaintiff had moved from a hard neck collar to a soft and more pliable neck collar, but she switched back into the hard neck collar when she felt pain. (R. 320.) Dr. Donadt noted that, on examination, Plaintiff stood erect and had a steady gait. (R. 320.) He identified tenderness in Plaintiff's neck and noted that she could rotate approximately twenty degrees to the right and five degrees to the left. (R. 320.) When Plaintiff extended her neck, she felt no radiating arm symptoms. (R. 320.) Dr. Donadt recommended that Plaintiff continue using her soft collar and taking pain medication. (R. 320.) He referred Plaintiff to a physical therapy program and discussed the exercises she should be practicing at home. (R. 320.) Dr. Donadt again stated that Plaintiff "remains totally disabled from her previous job at White Castle." (R. 320.)

During a visit to Dr. Donadt on October 24, 2011, Plaintiff reported substantially the same symptoms and recovery as she had during her September visit. (R. 319.) She had been unable to begin physical therapy because it had not yet been approved by her insurance carrier. (R. 319.) On November 28, 2011, Plaintiff returned to Dr. Donadt for a follow-up examination. (R. 321.) Her physical therapy sessions had just been approved by her insurance carrier. (R. 321.) Plaintiff reported that she used the soft neck collar only when she experienced increased pain, typically with increased activity and later in the afternoon and evening. (R. 321.) Plaintiff stated that she still experienced intermittent numbness in her arms. (R. 321.) Her rotation abilities had not changed since September of 2011. (R. 321.) Dr. Donadt discussed with Plaintiff whether she could return to work, and she told him that she could not yet perform the

required tasks and that White Castle did not have a light-duty job available.  (R. 321.)

On January 9, 2012, Plaintiff returned to Dr. Donadt's offices for a follow-up evaluation. (R. 322.)  Plaintiff reported that, over the course of six physical therapy sessions, her pain had improved.  (R. 322.)  She continued to feel pain when she was active and felt stiffness in her neck.  (R. 322.)  Her rotation was still restricted to the same degree as it had been since September of 2011.  (R. 322.)  Plaintiff told Dr. Donadt that she wanted to return to work but could not yet perform the duties required for her position.  (R. 322.)  She told Dr. Donadt that she was feeling depressed from spending her time at home, and he suggested that Plaintiff reach out to workers' compensation for a list of psychiatric or psychological health providers. (R. 322.)  Dr. Donadt also recommended that Plaintiff continue to increase her activity level.  (R. 322.)

On February 17, 2012, Plaintiff reported back to Dr. Donadt's office.  (R. 323.)  She informed Dr. Donadt that physical therapy had improved her pain and that she was able to move her neck "much better."  (R. 323.)  Plaintiff's insurance carrier informed her that it would not pay for her psychiatric evaluation, but she was in "much better spirits" because workers' compensation had begun paying her, including back pay.  (R. 323.)  Dr. Donadt noted that Plaintiff had a steady gait, that she maintained tightness and tenderness in her neck and that she still had relatively little ability to extend her neck.  (R. 323.)  Plaintiff had gained increased rotation in her neck, however, and could rotate thirty-five degrees to the right and ten degrees to the left.  (R. 323.)  Dr. Donadt wrote that Plaintiff "remain[ed] fully disabled from her previous job" but was "slowly improving."  (R. 323.)  He filled out a return-to-work form for Plaintiff, indicating that she could perform sedentary work and would like to return if White Castle could accommodate her.  (R. 323.)  Dr. Donadt encouraged Plaintiff to increase her activities "in

anticipation of returning to her regular job when she is able to."  (R. 323.)

On April 6, 2012, Plaintiff returned to Dr. Donadt's office for a follow-up appointment. (R. 325.)  Plaintiff told Dr. Donadt that Valium was improving the numbness and pain in her arms.  (R. 325.)  She reported that she had begun a new course of physical therapy involving acupuncture.  (R. 325.)  Dr. Donadt observed tightness and tenderness in Plaintiff's neck, with the same limited left rotation.  (R. 325.)  He further noted that she stood erect, with a steady gait, and that she had some increased strength in her arms and no pain in her shoulders.  (R. 325.)  Dr. Donadt recommended that Plaintiff continue her new physical therapy and practice exercises at home.  (R. 325.)  He wrote that she can perform only sedentary-type work.  (R. 325.)

Dr. Donadt made substantially the same examination findings on May 14, 2012, noting that he was encouraging Plaintiff to slowly increase her activities so that she could return to work when she was able.  (R. 324.)

On June 25, 2012, approximately one year after her cervical discectomy, Plaintiff saw Dr. Donadt for a follow-up appointment.  (R. 405.)  She informed Dr. Donadt that she typically felt good in the mornings and that her symptoms worsened in the afternoons.  (R. 405.)  She was taking Ultram, Naprosyn and Valium for her pain and numbness.  (R. 405.)  Plaintiff reported that her new physical therapy was helping her "quite a bit with decreased pain and increased strength in her arms."  (R. 405.)  She sometimes felt numbness in her arms and hands, and she had difficulty holding on to heavy shopping bags or objects that required grip and power. (R. 405.)  Plaintiff's x-rays reflected that since the neck surgery, the graft was incorporating well into her neck and she had good cervical alignment.  (R. 405.)  Dr. Donadt filled out forms for work "for limited duty," and Plaintiff said that type of work was not available at White Castle. (R. 405.)

Dr. Donadt's examination of Plaintiff in July of 2012 was substantially similar to his examination in June of 2012. (R. 406.) He noted that Plaintiff's physical therapy was helping her, and that although she was "totally disabled from her previous job," he encouraged her to increase her activities so that she could return to a more limited job. (R. 406.)

On August 27, 2012, Plaintiff told Dr. Donadt that approximately two weeks prior, she had almost fallen when she walked into a chair, but that she jerked her neck and developed an electric shock in her arms. (R. 407.) Plaintiff reported increased pain since that incident. (R. 407.) She was still experiencing pain in her neck, radiating across her shoulders, and intermittent pain in her arms and numbness down to her hands. (R. 407.) Plaintiff told Dr. Donadt that the physical therapy was still helping her, but that she was upset because she had undergone surgery over a year prior and had still not fully recovered. (R. 407.)

On September 24, 2012, Plaintiff told Dr. Donadt that she was still experiencing the same neck pain, with intermittent radiation and numbness in her arms and hands. (R. 408.) Plaintiff was experiencing difficulty when she tried to raise her arms above her head, but her physical examination results were substantially similar to those of previous months. (R. 408.)

On November 2, 2012, Plaintiff visited Dr. Donadt for a follow-up examination. (R. 409.) Her neck pain had not changed, and she still had difficulty lifting her arms over her head. (R. 409.) In addition, Plaintiff had difficulty holding and gripping heavier objects, and she was afraid of dropping things. (R. 409.) Dr. Donadt noted that diagnostic testing from Plaintiff's September visit reported evidence of "bilateral C5–C6 radiculopathy," also known as a pinched nerve. (R. 409.) Dr. Donadt wrote that he intended to have Plaintiff obtain a follow-up MRI of her cervical spine to evaluate possible cord compression. (R. 409.) The follow-up MRI was performed on November 30, 2012 and reflected a small disk herniation at the

C5–C6 and C6–C7 levels of Plaintiff's cervical spine.  (R. 402.)

On February 1, 2013, Plaintiff told Dr. Donadt that her arms were slowly improving. (R. 410.)  Dr. Donadt noted that Plaintiff was otherwise symptomatically the same as she had been in the previous months, and that she remained totally disabled from her previous job. (R. 410.)  Dr. Donadt informed Plaintiff that "she will probably never be able to return to her previous [job]" and that she would need to "try to find a lighter duty job which is more sedentary with limited lifting and not having to work over her head."  (R. 410.)

Plaintiff saw Dr. Donadt again on April 19, 2013.  (R. 411.)  She told Dr. Donadt that she had regained some movement in her neck and shoulders.  (R. 411.)  Plaintiff stated that her pain ebbed and flowed in episodes, occasionally varying with the outdoor climate.  (R. 411.)  Dr. Donadt noted that Plaintiff had "some increased rotation" in her neck compared to her last visit, and that she "still ha[d] some restricted motion in her shoulders, especially reaching over her head."  (R. 411.)  Plaintiff told Dr. Donadt that she was no longer going to physical therapy but was continuing her exercises at home.  (R. 411.)

Plaintiff returned to Dr. Donadt on June 7, 2013, approximately two years after her neck surgery.  (R. 412.)  She reported increased frequency and intensity of pain in her neck and arms, including numbness down to her hands and on the right side of her face.  (R. 412.)  Dr. Donadt told Plaintiff that he believed her lingering injuries were permanent and that, if additional symptoms developed, she should continue to be treated.  (R. 412.)  He encouraged her to continue practicing the strengthening and motion exercises that she had learned at physical therapy.  (R. 412.)  Dr. Donadt also noted that Plaintiff would "probably never be able to return to her previous job and should again try to find a lighter duty, more sedentary-type job." (R. 412.)

In a medical source statement dated September 6, 2013, Dr. Donadt stated that Plaintiff could sit in a working position, without reclining, for a maximum of one hour before alternating postures or standing. (R. 418.) Dr. Donadt indicated that Plaintiff had to sit with her head supported and upright, and that she could return to a seated position after a fifteen-minute break approximately every hour. (R. 418.) Plaintiff could sit for a total of four hours and stand for a total of two hours, cumulatively, during an eight-hour work day. (R. 418.) She could continuously walk for approximately thirty minutes before having to alternate postures or sit down. (R. 418.) Dr. Donadt indicated that Plaintiff would need to rest for some period of time during an eight-hour work day, but that morning, lunch and afternoon breaks would suffice. (R. 419.) He further indicated that Plaintiff would need a total of four hours to rest, cumulatively, during the work day. (R. 419.) Further in the statement, Dr. Donadt noted that Plaintiff would need to either stand and walk or rest for a total of four hours in an eight-hour work day, and that she could sit for a total of four hours, as well. (R. 419.) Plaintiff could "frequently" carry between one and five pounds, "occasionally" carry six to ten pounds and "rarely" or never carry more than ten pounds. (R. 420.) Plaintiff could "occasionally" stoop by bending the body downward and forward at the waist. (R. 420.) She could "occasionally" use her arms and hands to reach, seize, grasp, turn, pick, and pinch objects. (R. 420.) She could "rarely" or never move her neck forward, as if to look down at a table or desk, but she could "occasionally" move her neck backward, as if to look up to the ceiling, and rotate her neck left and right. (R. 421.) At the end of his medical source statement, Dr. Donadt hand-wrote a note stating that his conclusions were "estimates and not tested." (R. 421.)

### iv. Consultative examiners and state agency consultants

#### 1. Dr. David Hannanian

On March 7, 2012, Plaintiff was examined by pain specialist F. David Hannanian, M.D,
at her attorney's request. (R. 325, 399–401.) Dr. Hannanian performed a neurological
consultation for Plaintiff. (R. 399.) Plaintiff complained of neck pain with numbness radiating
into both arms and bilateral shoulder pain that limited her ability to lift and rotate. (R. 399.) Dr.
Hannanian noted that Plaintiff did not reflect any motor weakness in her extremities and that she
seemed alert, awake and attentive. (R. 400.) On motor examination tests, Plaintiff could extend
her neck to thirty-five degrees, where forty-five degrees is considered a full range of motion;
bend her neck to forty-five degrees, where sixty degrees is considered a full range of motion;
bend her neck to the side thirty degrees, where forty-five degrees is considered a full range of
motion, and rotate to the left and to the right sixty-five degrees, where eighty degrees is
considered a full range of motion. (R. 400.) Plaintiff had a "decreased range of motion" in her
shoulders. (R. 400.)

Dr. Hannanian recommended that Plaintiff undergo MRIs of her shoulders and cervical
spine and tests to rule out neuropathy in her arms. (R. 401.) He noted that Plaintiff "suffers
from ongoing neurological signs and symptoms" that required further treatment. (R. 401.) Dr.
Hannanian prescribed Naprosin and Valium for Plaintiff's pain and recommended an orthopedic
evaluation for her shoulders. (R. 367, 401.) He stated that in his medical opinion, Plaintiff's
work-related accident "is the provocative cause of injuries, impairments, and disability."
(R. 401.)

#### 2. Dr. John Miller

On June 27, 2012, John Laurence Miller, Ph.D., performed a consultative psychological

examination of Plaintiff at the Commissioner's request. (R. 326–29.) Plaintiff reported that she had a third-grade education. (R. 326.) She was then taking twelve prescription medications. (R. 326.) Plaintiff told Dr. Miller that she was experiencing some depressive symptoms that she believed were related to her unemployment. (R. 327.) She experienced dysphoric moods, crying spells and feelings of worthlessness. (R. 327.) Plaintiff said that she felt useless because she could not perform ordinary, everyday tasks, such as tying her shoelaces. (R. 327.) Dr. Miller noted that Plaintiff's thought processes seemed coherent and goal-directed with no evidence of hallucinations, delusions or paranoia. (R. 327.) Plaintiff's affect was dysphoric, exhibiting a state of generalized dissatisfaction or unease. (R. 328.) Dr. Miller noted that her attention and concentration were impaired "because of limited education." (R. 328.) Plaintiff's memory skills were impaired as a side effect of her medication. (R. 328.) Her intellectual functioning appeared to be average, and she had good insight and judgment. (R. 328.)

Dr. Miller diagnosed Plaintiff with an adjustment disorder with depressed mood, a cognitive disorder not otherwise specified and a memory disorder that appeared to be caused by medication. (R. 329.) He opined that Plaintiff would have some difficulty learning new tasks because of memory problems, but that she could perform complex tasks independently once they were learned. (R. 328.) She had trouble dealing with stress. (R. 329.) Plaintiff could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, make appropriate decisions and relate adequately with others. (R. 329.) Dr. Miller identified Plaintiff's mental difficulties as having been caused by psychiatric problems and cognitive deficits secondary to medication, but he stated that Plaintiff's psychiatric problems did not appear to be significant enough to interfere with her ability to function on a daily basis. (R. 329.) Dr. Miller recommended that Plaintiff see

a psychological therapist and attend vocational training and rehabilitation.  (R. 329.)  He noted that Plaintiff would need assistance to manage her finances because of her memory problems.  (R. 329.)

### 3.  Dr. Joyce Graber

On June 27, 2012, Plaintiff visited Dr. Joyce Graber for a consultative internal medicine examination at the Commissioner's request.  (R. 331–35.)  Plaintiff spoke some English.  (R. 331.)  Plaintiff reported a history of hearing loss, lupus and daily pain in her neck.  (R. 331.)  She assessed the intensity of her pain as a five out of ten in the mornings and a nine out of ten in the afternoons and evenings.  (R. 331.)  Plaintiff told Dr. Graber that she had experienced memory problems for the past three years and that she could walk approximately three to four blocks outdoors before she experienced too much pain to continue.  (R. 331.)  On physical examination, Plaintiff appeared not to be in acute distress.  (R. 332.)  She was able to walk normally, squat fully, change clothes and rise from her chair without difficulty.  (R. 332.)  Plaintiff's lung, heart and abdominal examinations were normal.  (R. 333.)  Dr. Graber noted that Plaintiff could bend her neck forward by twenty degrees and extend it to five degrees, and that Plaintiff could rotate her neck fifteen degrees bilaterally and bend her neck sideways five degrees.  (R. 333.)  Otherwise, Plaintiff had full range of motion in her upper and lower body.  (R. 333.)  Plaintiff's hand and finger dexterity were intact, and her grip was good.  (R. 334.)  Dr. Graber opined that, based on her examination that day, Plaintiff had "a mild limitation for lifting, carrying, bending and other such activities."  (R. 334.)

### 4.  Dr. T. Bruni

On July 3, 2012, T. Bruni, Ph.D., a state agency psychological consultant, performed a psychiatric review of Plaintiff at the Commissioner's request.  (R. 336–49.)  Dr. Bruni found that

Plaintiff had an unspecified cognitive disorder and memory deficit secondary to her medication. (R. 337.) He noted that Plaintiff had an "adjustment disorder with depressed mood." (R. 339), and, in rating Plaintiff's functional limitations, noted that she was mildly restricted in the activities of daily living, experienced mild difficulty in maintaining social functioning, experienced moderate difficulty in maintaining concentration and had never experienced an episode of deterioration of extended duration, (R. 346). Dr. Bruni concluded that Plaintiff was "not significantly limited" in her mental functioning, except that she was moderately limited in her ability to understand and remember detailed instructions and carry out those instructions. (R. 350.) Dr. Bruni stated that Plaintiff had a twelfth-grade education. (R. 352.) He found that Plaintiff was able to function daily and care for herself and for her children. (R. 352.) Dr. Bruni further stated that Plaintiff's allegations were "partially consistent with the evidence in the file," and that his findings "reveal[ed] evidence of psychiatric problems that [did] not appear to significantly interfere" with Plaintiff's daily functioning. (R. 352.)

### v. Rehabilitation clinic

In a letter dated September 4, 2013 and addressed "to whom it may concern," Dr. Xiaoliang Zhang, M.D., of Elmhurst United Medical, P.C., stated that Plaintiff was a patient in the rehabilitation medicine clinic for neck and bilateral shoulder pain. (R. 416.) Plaintiff attended physical therapy two to three times per week. (R. 416.)

### c. Additional evidence

### i. Function and disability reports

On May 23, 2012, Plaintiff completed a "function report." (R. 198–209.) Plaintiff reported that her daily activities involved maintaining her household, taking care of her children by getting them ready for school and fixing their beds, helping with her children's homework,

going to physical therapy, and cooking two times a day, often with her daughter's help. (R. 199–200, 202, 203, 209.) Plaintiff went to church every Sunday. (R. 203, 209.) She had a drivers' license. (R. 201.) Plaintiff said she could not sleep at night, clean, tie her shoes, drive or sing. (R. 199.) She could not keep her arms up for long, or lift or carry anything. (R. 199, 203.) She needed help dressing, ironing, mopping, cleaning the bathroom and cooking. (R. 199, 202.) Plaintiff reported that she could not walk because lupus made her ankles swell, and she could not sit for very long because her neck started to hurt. (R. 204.) Kneeling and squatting similarly caused her neck pain, and reaching caused her shoulder pain. (R. 204.) Plaintiff had no problem climbing stairs, using her hands, seeing, or hearing. (R. 204.) She used a neck brace when she cooked or drove her car. (R. 205.) She could walk four to five blocks before she had to rest for twenty minutes. (R. 205.) Plaintiff could handle her financial affairs, but they caused her stress. (R. 201, 206.) She stated that she could not follow spoken or written instructions or remember things. (R. 205–206.) In answering questions about her levels of pain, Plaintiff stated that since June 23, 2011, she had experienced neck and shoulder pain. (R. 206–207.) Her hands fell asleep, and her eyes felt like they were "going to come out." (R. 207.) Plaintiff was prescribed Tramadol, Hydroxychloroquine, Naproxen, Etodolac, Amlodipine and Hydrocodone. (R. 207.) She wore a neck brace. (R. 208.)

A July 23, 2012 "disability report" that was filled out by a paralegal working for Plaintiff's attorney stated that Plaintiff could not move her neck "at all" or sleep at night due to pain in her neck and arm. (R. 222.) She said Plaintiff had "severe" depression because she could not cook, clean, wash her hair, or work. (R. 222, 226.)

### ii. Mental health expert's testimony

Julian Clark, M.D., a board-certified psychiatrist, testified as a mental health expert at

Plaintiff's hearing. (R. 52–53.) Based on his review of the medical evidence, Dr. Clark opined that Plaintiff had a mental health impairment but that the impairment was not severe. (R. 53.) Dr. Clark did not ask Plaintiff questions at the hearing and he stated that he had never treated her. (R. 53.)

### iii.   Vocational expert's testimony

Amy Peiser Leopold testified as a vocational expert at Plaintiff's hearing. (R. 54–61.) Leopold described Plaintiff's cashier work at White Castle as "light unskilled work," Plaintiff's work as a fast-food cook at White Castle as "medium, semi-skilled work," Plaintiff's work as a manicurist as "sedentary, semi-skilled work," Plaintiff's factory work as a "hand trimmer" as "light, unskilled work," and Plaintiff's babysitting work as "medium, semi-skilled work" that likely was performed as light work because of the age of the children. (R. 55–56, 59.)

The ALJ asked Leopold to consider whether a person of Plaintiff's age, education and work history, who was limited to performing sedentary work and could not reach overhead, could perform any of Plaintiff's past relevant work. (R. 60.) Leopold testified that such a person would be able to perform only Plaintiff's past work as a manicurist, which would not require any overhead reaching. (R. 60.) Plaintiff's attorney then asked Leopold whether a person of Plaintiff's age, education and work history, who was limited to performing sedentary work and could not rotate her neck or move it forward and backward, could perform any of Plaintiff's past relevant work. (R. 61.) Leopold responded that such a person could not perform any of Plaintiff's past relevant work, and that there would be no other sedentary, unskilled work in the national economy for such a person. (R. 61.)

### d.   The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the Social Security

Administration under the authority of the Social Security Act (the "SSA"). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 1, 2011, the onset date of Plaintiff's disability. (R. 23.)

### i. Step two

At step two of the sequential analysis, the ALJ found that Plaintiff had the following severe impairments: lupus, status post-cervical discectomy and status post-ovarian cyst removal. (R. 23.) He also found that Plaintiff had the following non-severe impairments: obesity, hypertension and an adjustment disorder. (R. 23.)

In making his determination that Plaintiff's adjustment disorder was not severe, the ALJ noted that both Dr. Clark, the medical expert at Plaintiff's disability hearing, and Dr. Miller, the psychiatric consultant who examined Plaintiff, found that Plaintiff's mental impairment did not seem so severe as to "interfere with [Plaintiff's] ability to function on a daily basis." (R. 24.) The ALJ also considered the four broad functional areas, known as the "Paragraph B criteria," set out in the disability regulations for evaluating mental disorders. (R. 24.) In the first functional area, activities of daily living, the ALJ found that Plaintiff had no limitation attributable to her mental impairment, as opposed to her physical impairment. (R. 24.) In the second functional area, social functioning, the ALJ found that Plaintiff had no limitation. (R. 24.) The ALJ noted that Plaintiff interacted well with her family, visited her sister and attended church. (R. 24.) In the third functional area, concentration, persistence or pace, the ALJ found that Plaintiff had "mild limitation" because her cognitive testing had shown some impairment in concentration. (R. 24.) The ALJ noted, however, that Plaintiff had not had mental health treatment. (R. 24.) In the fourth functional area, "episodes of decompensation," the ALJ found that Plaintiff had not experienced any episodes of decompensation of extended

duration.  (R. 24.)  Applying these findings to the Paragraph B criteria, the ALJ determined that

Plaintiff's mental impairment — an adjustment disorder — caused "no more than 'mild'

limitation in any of the first three functional areas and 'no' episodes of decompensation which

have been of extended duration in the fourth area."  (R. 24.)  Accordingly, the ALJ determined

that Plaintiff's mental impairment was not severe.  (R. 24.)  The ALJ noted that the Paragraph B

criteria existed to rate the severity of mental impairments at steps two and three of the sequential

evaluation process, but that he would conduct a more detailed assessment of Plaintiff's mental

residual functional capacity in steps four and five of the process.  (R. 24.)

### ii.  Step three

The ALJ next found that Plaintiff did not have an impairment or combination of

impairments that meets, or is equal to, the severity of one of the impairments listed in Appendix

1 of the Social Security Regulations, and specifically considered Listings 1.00, 6.00 and 14.00

and Social Security Ruling 02-1p.  (R. 24.)  The ALJ first considered Listing 1.00, pertaining to

musculoskeletal impairments, and found no evidence that Plaintiff could not ambulate effectively

or perform fine and gross movements effectively, as defined in the listing.  (R. 25.)  The ALJ

also found no evidence that Plaintiff had nerve root compression, characterized by "neuro-

anatomic distribution of pain with limitation of motion of the spine, motor loss involving atrophy

with associated muscle weakness, sensory or reflex loss, or positive straight leg raise testing."

(R. 25.)  The ALJ then considered Listing 6.00, pertaining to genitourinary impairments, and

found no evidence that Plaintiff's renal or kidney function was impaired or that Plaintiff suffered

from "persistent motor or sensory neuropathy that is a severe impairment on its own."  (R. 25.)

The ALJ also considered Listing 14.00, pertaining to an immune system disorder, and found

insufficient evidence of systemic lupus erythematosus, among other infections, or of

inflammatory arthritis resulting in the inability to ambulate effectively or the inability to perform fine and gross movements.  (R. 25.)  Finally, the ALJ considered Social Security Ruling 02-1p, pertaining to obesity, and found that Plaintiff's impairments in combination with obesity did not meet the requirements of a listing and that Plaintiff's obesity, by itself, was not medically equivalent to a listing.  (R. 25.)

### iii.  Step four

At step four, the ALJ determined that Plaintiff "has the residual functional capacity to perform sedentary work as defined in 20 CFR [§] 404.1567(c)," except that Plaintiff "can lift/carry 10 pounds occasionally and less than 10 pounds frequently, sit for 6 hours in an 8-hour workday, and stand/walk for 2 hours in an 8-hour workday."  (R. 25.)  He also determined that Plaintiff "can perform minimal reaching overhead with the upper extremities."  (R. 25.)  In making this finding, the ALJ outlined a two-step process, first considering whether Plaintiff had "an underlying medically determinable physical or mental impairment" that could reasonably be expected to produce her symptoms, and then evaluating "the intensity, persistence and limiting effects of [Plaintiff's] symptoms to determine the extent to which they limit [her] functioning." (R. 26.)  The ALJ considered Plaintiff's disability and function reports and testimony at the disability hearing and found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but that Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms" were not entirely credible.  (R. 26.)

The ALJ found that Plaintiff's reported activities of daily living "were not limited to the extent that one would expect" given her disability.  (R. 27.)  For instance, he noted that Plaintiff was able to drive, read the Bible, and stand and sit intermittently in church.  (R. 27.)  Plaintiff

was able to take the bus and the subway and make her children's beds, as well. (R. 27.) The ALJ also noted that Plaintiff had provided "conflicting information about her education level," first reporting that she completed the twelfth grade, then the third grade, and then "testif[ying] to completing two years of college." (R. 27.) The ALJ reviewed the examination notes of Dr. Hannanian, Dr. Graber and Dr. Donadt, according "great weight" to Dr. Donadt's repeated opinions that Plaintiff could return to sedentary work because the opinions were supported by treatment notes and were "consistent with the record overall showing findings documenting improvement." (R. 28.) The ALJ further found that although Plaintiff alleged she experienced severe depression, Plaintiff had not sought mental health treatment; that although Plaintiff stated she could not move her neck, the record reflected only "mild limitation" in the range of motion for her neck; that although Plaintiff alleged an inability to stand for long periods of time, she consistently reported "no radiation of pain to the legs"; and that although Plaintiff stated that she laid in bed all day and only rose to vomit from her medication, she had not complained of significant side effects for the majority of her treatment. (R. 29.)

In reaching his conclusion regarding Plaintiff's residual functional capacity ("RFC"), the ALJ accorded "limited weight" to Dr. Donadt's medical source statement of September 6, 2013 because it was "not supported by his treatment notes in which he consistently opined that [Plaintiff] can perform sedentary work with no overhead activities," and because it was only an estimate and not based on testing. (R. 29.) The ALJ accorded "some weight" to the opinion of Dr. Graber, the internal medicine consultative examiner, because Dr. Graber's opinion was "somewhat vague," although it indicated that Plaintiff had physical limitations that were consistent with the record overall. (R. 29.)

The ALJ also accorded "limited weight" to Dr. Bruni's opinion that Plaintiff exhibited

"moderate limitation in concentration" because Dr. Bruni "did not review the entire record reflecting no mental health treatment." (R. 29.) However, the ALJ accorded "significant weight" to the remainder of Dr. Bruni's opinion because it was "consistent with the record overall showing no significant mental limitations." (R. 29.) The ALJ also accorded "limited weight" to Dr. Zhao's opinions because they were "not well explained and predate[d] [Plaintiff's] surgery," and because they were "inconsistent with the record overall, especially Dr. Donadt's treatment notes reflecting improvement post-surgery." (R. 29.)

### iv.  Step five

At step five of the five-step sequential analysis, the ALJ determined that Plaintiff was capable of performing her past relevant work as a manicurist because that job did not require tasks precluded by Plaintiff's RFC. (R. 30.) The ALJ concluded that, given Plaintiff's age, education, work experience and RFC, there were other jobs existing in significant numbers in the national economy that Plaintiff could perform. (R. 30.) Therefore, the ALJ determined that from May 1, 2011 through the date of his decision, Plaintiff had not been under a "disability" as defined under the SSA. (R. 31.)

## II.  Discussion

### a.  Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*,

805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971));

*McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same). Once an ALJ finds facts, the court

"can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault*

*v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks

omitted). In deciding whether substantial evidence exists, the court "defer[s] to the

Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d

118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one

rational interpretation, the Commissioner's conclusion must be upheld."). The Commissioner's

factual findings "must be given conclusive effect so long as they are supported by substantial

evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations

omitted). If, however, the Commissioner's decision is not supported by substantial evidence or

is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*,

3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).

"In making such determinations, courts should be mindful that '[t]he Social Security Act is a

remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'"

*McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008)

(alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

      **b.   Availability of benefits**

      Federal disability insurance benefits are available to individuals who are "disabled"

within the meaning of the Social Security Act. To be eligible for disability benefits under the

Act, the plaintiff must establish his or her inability "to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A). The Commissioner has promulgated a five-step analysis for evaluating disability claims. 20 C.F.R. § 404.1520. The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)); *see also Lesterhuis*, 805 F.3d at 86 n.2 (describing the "five-step sequential evaluation for adjudication of disability claims, set forth at 20 C.F.R. § 404.1520").

### c. Analysis

Plaintiff moves for judgment on the pleadings, arguing that the ALJ lacked substantial evidence for his determination that Plaintiff was not disabled and erred in (1) failing to find that Plaintiff's impairment meets or equals the severity of the spinal disorders in Appendix 1, (2) according "limited weight" to Dr. Donadt's September 3, 2016 medical source statement in

assessing Plaintiff's RFC, (3) finding that Plaintiff's statements about the intensity, persistence and limiting effects of her symptoms were not entirely credible in assessing Plaintiff's RFC, and (4) determining that Plaintiff can perform her past work as a manicurist despite her limitations.[2] (Pl. Mem. 8–9.) The Commissioner cross-moves for judgment on the pleadings, arguing that the ALJ's determination that Plaintiff was not disabled was supported by substantial evidence. (Comm'r Mem. 20–32.)

### i. The ALJ's failure to find a listed impairment

At step three of the five-step sequential process, the ALJ determines whether a claimant's impairment or combination of impairments is sufficiently severe to meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1"). 20 C.F.R. § 404.1520(d). If a claimant has such an impairment, the ALJ will find the claimant disabled

---

[2] It is unclear whether Plaintiff also challenges the ALJ's decision that Plaintiff's adjustment disorder is non-severe. (*See* Pl. Mem. 8 ("While the ALJ notes that Plaintiff did not receive mental health treatment, he ignores the Plaintiff's clear financial limitations in receiving [the] same.").) To the extent that Plaintiff does challenge the decision as to her mental impairment, that decision would at most constitute harmless error at step two of the five-step sequential process, where the ALJ recognized other severe impairments and considered Plaintiff's mental health limitations in determining her RFC. *See O'Connell v. Colvin*, 558 F. App'x 63, 65 (2d Cir. 2014) (finding that any error by the ALJ in excluding the claimant's knee injury as a severe impairment was harmless because the ALJ identified other severe impairments and considered the knee injury in subsequent steps); *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (finding that any error by the ALJ in excluding claims of anxiety disorder and panic disorder from step two would be harmless because the ALJ identified other severe impairments and specifically considered the claims of anxiety and panic attacks in subsequent steps (citing *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010))); *Stanton v. Astrue*, 370 F. App'x 231, 233 n.1 (2d Cir. 2010) (finding remand would not be warranted due to the ALJ's failure to recognize disc herniation as a severe impairment because "the ALJ did identify severe impairments at step two, so that [plaintiff's] claim proceeded through the sequential evaluation process" and the ALJ considered the "combination of impairments" and "all symptoms" in making determination); *Lasiege v. Colvin*, No. 12-CV-1398, 2014 WL 1269380, at *10–11 (N.D.N.Y. Mar. 25, 2014) (holding that, even if the ALJ erred in failing to list headaches as severe impairment at step two, such error was harmless because other severe impairments were found and the ALJ explicitly noted claimant's headaches during RFC determination).

without considering the claimant's age, education or work experience. *Id.*; *see also DeChirico v. Callahan,* 134 F.3d 1177, 1180 (2d Cir. 1998) ("The Social Security regulations list certain impairments, any of which is sufficient, at step three, to create an irrebuttable presumption of disability." (citing 20 C.F.R. §§ 404.1520(d), 416.920(d))). Plaintiff argues that the ALJ erroneously found that Plaintiff's impairment did not meet or equal Listing 1.04A of Appendix 1, despite Plaintiff's MRI findings, examinations and cervical discectomy and fusion. (Pl. Mem. 9.) The Commissioner argues that the ALJ correctly found that Plaintiff's impairment was not sufficiently severe to meet the requirements of Listing 1.04A. (Comm'r Mem. 21.)

Each listing in Appendix 1 has a set of criteria that must be met for an impairment to be deemed conclusively disabling. The claimant bears the burden of demonstrating that her impairments meet or are equal in severity to each of the medical criteria set forth in one of the listings. *See Claymore v. Astrue*, 519 F. App'x 36, 37 (2d Cir. 2013) ("The claimant must present medical findings equal in severity to all the criteria for the one most similar listed impairment." (internal quotation marks omitted) (quoting *Brown v. Apfel*, 174 F.3d 59, 64 (2d Cir. 1999))); *Otts v. Comm'r of Soc. Sec.*, 249 F. App'x 887, 888 (2d Cir. 2007) (noting that it is the plaintiff's burden to demonstrate that [her] disability [meets] all of the specified medical criteria of a spinal disorder (internal quotation marks omitted) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990))). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."[3] *Sullivan*, 493 U.S. at 530.

---

[3] However, "[e]ven if a claimant's impairment does not meet the specific criteria of a Medical Listing, it still may equal the Listing." *Ryan v. Astrue*, 5 F. Supp. 3d 493, 507 n.12 (S.D.N.Y. 2014) (quoting *Valet v. Astrue*, 10-CV-3282, 2012 WL 194970, at *13 (E.D.N.Y. Jan. 23, 2012)). Specifically, "[t]he Commissioner will find that a claimant's impairment is medically equivalent to a Medical Listing if: (1) the claimant has other findings that are related to his or her impairment that are equal in medical severity; (2) the claimant has a 'closely analogous'

Listing 1.04A, titled "Disorders of the spine," (the "Listing"), provides, in relevant part:

> *Disorders of the spine* (*e.g.*, herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in a compromise of a nerve root (including cauda equine) or the spinal cord. [Combined] With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpart P, App. 1 § 1.04A. Thus, to establish that she meets the listing, Plaintiff must demonstrate that she suffered (1) nerve root or spinal cord compromise, with (2) neuro-anatomic distribution of pain, (3) limitation of motion in her spine, and (4) motor loss, accompanied by sensory or reflex loss. *Id.*; *cf. Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 76 (2d. Cir. 2012) ("Under Listing 1.04(A), such a disorder can be demonstrated by evidence of nerve root compression accompanied by sensory or reflex loss.").

An ALJ is required to explain his determination that a claimant failed to meet or equal the listings "[w]here the claimant's symptoms as described by the medical evidence appear to match those described in the [l]istings." *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 273 (N.D.N.Y. 2009); *see also Norman v. Astrue*, 912 F. Supp. 2d 33, 78–79 (S.D.N.Y. 2012) (examining the medical record and reversing after there was not "sufficient contradicted evidence in the record to provide substantial evidence for the conclusion that [the] plaintiff failed to meet step three" (alteration, citation and internal quotation marks omitted)). Nevertheless, "[a]n ALJ's unexplained conclusion [at] step three of the analysis may be upheld where other portions of the

---

impairment that is 'of equal medical significance to those of a listed impairment;' or (3) the claimant has a combination of impairments that are medically equivalent." *Id.* (citation omitted).

decision and other 'clearly credible evidence' demonstrate that the conclusion is supported by substantial evidence.'" *Ryan*, 5 F. Supp. 3d at 507 (citing *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)). In *Berry*, the Second Circuit upheld an ALJ's decision that the plaintiff did not meet a listed impairment, even where the ALJ failed to explain the rationale for his decision. *Berry*, 675 F.2d at 469. In so doing, the Second Circuit also circumscribed its holding:

> [I]n spite of the ALJ's failure to explain his rejection of the claimed listed impairments, we were able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence. Cases may arise, however, in which we would be unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ. In such instances, we would not hesitate to remand the case for further findings or a clearer explanation for the decision. Thus, in future cases in which the disability claim is premised upon one or more listed impairments of Appendix 1, the Secretary should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment.

*Id.* (citations omitted); *see also Sanders*, 506 F. App'x at 76 (declining to remand at step three because although "the record contain[ed] evidence of nerve root compression, [it] also contain[ed] substantial evidence supporting the conclusion that there was no nerve root compression"); *Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 112–13 (2d Cir. 2010) ("Here, although the ALJ might have been more specific in detailing the reasons for concluding that plaintiff's condition did not satisfy a listed impairment, other portions of the ALJ's detailed decision, along with plaintiff's own testimony, demonstrate that substantial evidence supports this part of the ALJ's determination." (citing *Berry*, 675 F.2d at 469)); *Otts*, 249 F. App'x at 889 ("While the ALJ might have been more specific in detailing the reasons for concluding that [the plaintiff's] condition did not satisfy a listed impairment, the referenced medical evidence, together with the lack of compelling contradictory evidence from the plaintiff, permits us to affirm this part of the challenged judgment." (citing *Berry*, 675 F.2d at 468)); *Mongeur v.*

*Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam) (noting that when "the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability"). By contrast, "where the evidence on the issue of whether a claimant meets or equals the listing requirements is equipoise and 'credibility determinations and inference drawing is required of the ALJ' to form his conclusions at step three, the ALJ must explain his reasoning." *Ryan*, 5 F. Supp. 3d at 507–08 (alteration omitted) (quoting *Berry*, 675 F.2d at 469).

In apparently considering Listing 1.04, the ALJ simply stated that "[t]here is no evidence of nerve root compression characterized by neuro-anatomic distribution of pain with limitation of motion of the spine, motor loss involving atrophy with associated muscle weakness, sensory or reflex loss, or positive straight leg raise testing." (R. 25.) As explained below, the ALJ's statement is incorrect, and there is at least some evidence that Plaintiff's impairment met the criteria of the Listing.[4] However, because Plaintiff has not demonstrated that her impairment meets *each* medical criterion in the Listing, the Court finds no reversible error in the ALJ's assessment of Plaintiff's impairment under the Listing. *See Claymore*, 519 F. App'x at 37; *Otts*, 249 F. App'x at 888.

### 1. Nerve root or spinal cord compression

The medical record contains some evidence that Plaintiff experienced nerve root or spinal cord compression as required by the Listing. *See* 20 C.F.R. Pt. 404, Subpart P, App. 1 § 1.04A.

---

[4] Neither party appears to dispute that Plaintiff met the threshold criterion of a spinal disorder — specifically, a herniated disk. *See Otts*, 249 F. App'x at 888 ("Section 1.04A defines a disorder of the spine as, *inter alia*, a 'herniated nucleus pulposus' — *i.e.*, a herniated disk — 'resulting in compromise of a nerve root . . . or the spinal cord' . . . .").

Shortly after Plaintiff's accident at work, doctors at the Flushing Hospital ER diagnosed Plaintiff with cervical disc disease, characterized by radiating pain in the nerves of her back. (R. 262.) An MRI performed on June 15, 2011, reflected a large disc herniation at C4–C5 compressing Plaintiff's spinal cord. (R. 311–12.) The Commissioner argues, without support, that these symptoms did not occur during the "relevant time period" because Plaintiff later underwent surgery for her cervical spine. (Comm'r Mem. 21.) More than a year after Plaintiff's surgery, however, she was periodically reporting increased frequency and intensity of pain in her neck, which prompted Dr. Donadt to suggest follow-up diagnostic testing and MRIs. (R. 402–409.) In November of 2012, Dr. Donadt noted that Plaintiff's diagnostic testing reflected evidence of "bilateral C5–C6 radiculopathy," also known as a pinched nerve. (R. 409.) The follow-up MRI, however, reflected no nerve or spinal cord compression, but rather a small disk herniation. (R. 402.)

### 2. Neuro-anatomic distribution of pain

Similarly, the medical record contains some evidence that Plaintiff experienced "neuro-anatomic distribution of pain" as required by the Listing. *See* 20 C.F.R. Pt. 404, Subpart P, App. 1 § 1.04A. Although the radiating numbness that Plaintiff felt in her arms abated after her surgery, she continued to experience intermittent numbness and electric shocks in her arms and numbness in her face for two years after her surgery. (*See* R. 320–21, 405, 407–408, 412.) Dr. Hannanian, who examined Plaintiff in March of 2012, noted that Plaintiff "suffer[ed] from ongoing neurological signs and symptoms" that required further treatment. (R. 401.) These symptoms were somewhat relieved by Plaintiff's medication, (R. 325), but, as late as June of 2013, Plaintiff reported to Dr. Donadt that she was experiencing increased frequency and intensity of pain and numbness in her arms, down to her hands, (R. 412).

### 3. Limitation of motion of the spine

The medical record also reflects that Plaintiff experienced "limitation of motion of the spine." *See* 20 C.F.R. Pt. 404, Subpart P, App. 1 § 1.04A. Dr. Donadt, Dr. Hannanian, Dr. Graber and Plaintiff's physical therapist at Flushing Hospital Medical Center repeatedly noted that Plaintiff lacked full forward flexion in her neck and could not fully rotate her neck to the left or right. (*See, e.g.*, 317–18, 321–23, 434, 446.) Indeed, Dr. Donadt noted after nearly every session with Plaintiff that she exhibited restricted motion of her neck, particularly on rotation. (*See, e.g.*, R. 317, 323.)

### 4. Motor loss accompanied by sensory or reflex loss

There is little evidence in the medical record that Plaintiff experienced "motor loss . . . accompanied by sensory or reflex loss." *See* 20 C.F.R. Pt. 404, Subpart P, App. 1 § 1.04A. The Listing defines "motor loss" as "atrophy with associated muscle weakness" or "muscle weakness." *Id.* Appendix 1 further specifies that "significant motor loss" may be shown by an "[i]nability to walk on the heels or toes, to squat, or to arise from a squatting position." 20 C.F.R. Pt. 404, Subpart P, App. 1 § 1.00(E)(1).

Plaintiff has not demonstrated motor loss accompanied by sensory or reflex loss. Every doctor who examined Plaintiff, even when her pain was at its most severe, found that Plaintiff's gait was steady, her grip was good and her hand and finger dexterity were intact. (*See, e.g.*, R. 333, 450, 465.) Dr. Graber found that Plaintiff was able to walk normally, squat fully, change clothes and rise from her chair without difficulty. (R. 332.) Dr. Hannanian noted that Plaintiff did not exhibit any motor weakness in her extremities. (R. 400.) Dr. Donadt often noted that Plaintiff had good strength in her arms and legs, (R. 325), although on one occasion Plaintiff

reported that she had difficulty holding on to heavy shopping bags or objects that required grip, (R. 405).

Here, although the ALJ has not followed the Second Circuit's directive in *Berry* to "set forth a sufficient rationale in support of his decision to find or not to find a listed impairment," *Berry*, 675 F.2d at 469, neither has the ALJ committed reversible error, *see id*.  The absence of support in the medical record for a criterion of the Listing requires a finding that the ALJ's decision was supported by substantial evidence, notwithstanding the lack of specificity in the ALJ's step-three determination.  *See Claymore*, 519 F. App'x at 37 (upholding the ALJ's step-three decision where the plaintiff failed to meet one criterion of the Listing); *Sanders*, 506 F. App'x at 76 (holding that where the record reflected conflicting evidence of nerve root compression, "there is substantial evidence in the record supporting the Commissioner's decision that [the plaintiff] did not suffer from a listed impairment").  Accordingly, because this is not a case "in which we would be unable to fathom the ALJ's rationale in relation to evidence in the record," the Court need not remand to the ALJ for clarification of Plaintiff's impairment under Listing 1.04.  *See Salmini*, 371 F. App'x at 113 (quoting *Berry*, 675 F.2d at 469).

ii.    **The ALJ's failure to appropriately weigh Dr. Donadt's medical source statement**

Plaintiff argues that the ALJ erred in according "limited weight" to Dr. Donadt's September 3, 2016 medical source statement (the "Medical Source Statement"), "wherein he specifically indicates the very specific limitations on work activity imposed by Plaintiff's condition," in assessing Plaintiff's RFC.  (Pl. Mem. 9.)  The Commissioner argues that the ALJ appropriately accorded reduced weight to the Medical Source Statement because it was inconsistent with Dr. Donadt's own treatment notes, "in which he had consistently found that [P]laintiff had good strength and sensation in the arms and legs and opined that [P]laintiff could

perform sedentary work with no overhead activities." (Comm'r Mem. 26.)

Under the Social Security Regulations, a "treating source" is defined as a plaintiff's "own physician, psychologist, or other acceptable medical source" who has provided plaintiff "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 416.902; *see also Bailey v. Astrue*, 815 F. Supp. 2d 590, 597 (E.D.N.Y. 2011). "[A] treating physician's statement that the claimant is disabled cannot itself be determinative." *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (same). However, a treating physician's opinion as to the "nature and severity" of a plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record." 20 C.F.R. § 404.1527(c)(2); *see Lesterhuis*, 805 F.3d at 88 (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur*, 722 F.2d at 1039 n.2)).

When a treating source opinion contradicts other substantial evidence, such as the opinions of other medical experts, it may not be entitled to controlling weight. *See Williams v. Comm'r of Soc. Sec.*, 236 F. App'x 641, 643–44 (2d Cir. 2007); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). A treating physician's opinion may also be discounted when it is internally inconsistent. *See Micheli*, 501 F. App'x at 28.

An ALJ must consider a number of factors to determine the amount of weight to assign to a treating physician's opinion, specifically: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2) and discussing the factors). The ALJ must set forth the reasons for the weight assigned to the treating physician's opinion. *Halloran*, 362 F.3d at 32. While the ALJ is not required to discuss the factors explicitly, it must be clear from the decision that the proper analysis was undertaken. *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)). Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders*, 506 F. App'x at 77; *see also Halloran*, 362 F.3d at 32–33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians['] opinion . . . .").

Here, the ALJ inadequately explained his reasons for according "limited weight" to the Medical Source Statement. (*See* R. 29.) The ALJ noted that Dr. Donadt's "form opinion" was "not supported by his treatment notes in which he consistently opined that [Plaintiff] can perform sedentary work with no overhead activities." (R. 29.) "Moreover," the ALJ continued, "Dr. Donadt indicated in the form that his opinion was only an estimate and not based on testing." (R. 29.)

Although Dr. Donadt did write that the Medical Source Statement was based on "estimates" that "[were] not tested," (R. 421), the instructions on the Medical Source Statement expressly state and underline for emphasis that a doctor is "not required to perform any special test of functional capacity to render [his] opinions on this form," and that in fact, the form should be "based on [the doctor's] clinical evaluation and test findings." (R. 418.) The medical record in this case provides Dr. Donadt's nearly-monthly treatment notes over the course of two-and-a-half years treating Plaintiff, including numerous tests of Plaintiff's functional capacity. There is no indication that the Medical Source Statement, based on that two-and-a-half years of treatment, is anything but "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and it should therefore be given "controlling weight" provided it "is not inconsistent with the other substantial evidence in [Plaintiff's] case record." 20 C.F.R. § 404.1527(c)(2).

Furthermore, while the ALJ is correct that Dr. Donadt's treatment notes state that Plaintiff can perform sedentary work with no overhead activities, nothing in Dr. Donadt's Medical Source Statement is inconsistent with those treatment notes. Dr. Donadt indicated that Plaintiff could sit for four hours in an eight-hour work day, as long as she was able to sit with her head supported and upright and could alternate postures or stand every hour. (R. 418.) This is consistent with Dr. Donadt's repeated observations that Plaintiff retained tenderness and stiffness in her neck and that she continued to use a neck brace or collar for over a year after her surgery, as well as notes from Plaintiff's physical therapist that Plaintiff could sit straight for twenty-to-thirty minutes at a time before needing to change positions. (R. 321, 323, 440.) Dr. Donadt indicated that Plaintiff could continuously walk for approximately thirty minutes before having to alternate postures or sit down, (R. 418), which is consistent with his observations, and observations of Plaintiff's physical therapist, that Plaintiff could walk approximately three to five

blocks at a time before she had to rest, (R. 440). Dr. Donadt indicated that Plaintiff would need periods of rest throughout the work day, but that a morning, lunch and afternoon break would suffice. (R. 419.) This is consistent with Dr. Donadt's repeated observations that Plaintiff could perform tasks for short periods of time before she was overwhelmed by pain. Finally, Dr. Donadt indicated that Plaintiff could rarely or never flex her neck forward, as if to look down at a table or desk, but could "occasionally" move it backward or rotate it left and right. (R. 420–21.) This is consistent with Dr. Donadt's repeated observations that even as Plaintiff gained increased ability in her neck, she was still severely limited and possessed relatively little ability to extend her neck. (R. 323.) It is also consistent with Dr. Donadt's recommendation to Plaintiff in February of 2013 that she "try to find a lighter duty job which is more sedentary with limited lifting and not having to work over her head." (R. 410.) Finally, it is consistent with Dr. Hannanian's motor examination tests, in which Plaintiff exhibited a decreased range of motion in extension and flexion of her neck, (R. 400), and Dr. Graber's motor examination tests, in which Plaintiff exhibited the same restrictions, (R. 333).

Particularly in a case such as this, where Plaintiff's treatment in other respects lacked continuity, a treating physician's opinion as to the nature and severity of Plaintiff's impairments must be given controlling weight unless it is inconsistent with the record. *See Petrie*, 412 F. App'x at 405 ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (citation omitted)). Here, the Medical Source Statement is entirely consistent with over two years of Dr. Donadt's treatment notes. Even were it not, the ALJ failed to appropriately assess the weight the Medical Source Statement should receive. *See Greek*, 802 F.3d at 375 ("Nevertheless, even

when a treating physician's opinion is not given controlling weight, SSA regulations require the ALJ to consider several factors in determining how much weight the opinion should receive." (citing 20 C.F.R. § 404.1527(c)(2)(i)–(ii))). Because the ALJ rested his rejection of the Medical Source Statement on flawed reasoning and failed to provide any other reasons for rejecting the opinion, the ALJ erred. *See id.* at 376.

Plaintiff correctly notes that the Medical Source Statement specifies important limitations on Plaintiff's RFC, and the Court accordingly remands for appropriate consideration of the Medical Source Statement in rendering Plaintiff's RFC. Because the Court remands the case for further consideration of Plaintiff's RFC, the Court will not address Plaintiff's remaining arguments, as the ALJ's error at step four impacts the Court's ability to review the ALJ's determination at step five.

## III. Conclusion

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is granted, and the Commissioner's cross-motion for judgment on the pleadings is denied. The Commissioner's decision is vacated, and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is directed to close this case.

SO ORDERED:

       s/ MKB
_____
MARGO K. BRODIE
United States District Judge

Dated: September 21, 2016
      Brooklyn, New York